Terence M Kearney v. Asset Acceptance, LLC Complaint for unlawful Debt Collection Violations

Terence M Kearney
PO Box 1207
Scappoose, OR 97056

FILED 1 MAR '13 10:19 USDC-ORP

# IN THE UNITED STATES COURT FOR
# THE DISTRICT OF OREGON
## PORTLAND DIVISION

TERENCE M KEARNEY,

Plaintiff,

vs.

ASSET ACCEPTANCE, LLC,

Defendant

Case No. 3:13 - CV - 352 HU,

Complaint and Demand for Jury Trial

(Unlawful Debt Collection Practices)

## COMPLAINT FOR CIVIL PENALTIES, INJUNCTIVE
## AND OTHER RELIEF

Plaintiff, TERENCE M KEARNEY, acting Pro Se, provides notification and alleges the following complaint for fair debt collection practice act violations by Defendant, Asset Acceptance LLC, in it's total disregard of FTC's Consent Decree for "clarity" of policies and "expectations", of additionally taking exceptions to previously agreed consumer protection practices, of violating injunctions for permanent restraints levied to avoid deceiving consumers into paying time-barred debts resulting in a \$2.5 million dollar civil penalty, for further violations of the fair debt collection practices act, the Oregon fair debt collections practices act, the Oregon unlawful debt collection practice act and for intentional infliction of emotional distress induced by a billion dollar Corporate behemoth on an individual wage earner. Defendant requests a jury trial and injunctive relief.

## JURISDICTION AND VENUE



Complaint Unlawful Debt Collection Violations - 1

1. This is an action arising under Sections 5(a), 5(m)( 1 )(A), I3(b), and 16(a) of the Federal Trade Commission Act ("FTC Act"), 15 U.S.C. §§ 45(a), 45(m)(I)(A), 53(b), and 56(a); the Fair Credit Reporting Act ("FCRA"), 15 U.S.C. §§ I68I~168Ix; and the Fair Debt Collection Practices Act ("FDCPA"), 15 u. S.C. §§ 1692-1692p, to obtain monetary civil penalties, a permanent injunction, restitution, disgorgement, and other equitable relief for Defendant's violations of Section 5 of the FTC Act, the FCRA, and the FDCPA.

2. This Court has jurisdiction over this matter under 28 U.S.C. §§ 1331, 1337(a), 1345, and 1355, and under 15 U.S.C. §§ 45(a)(I), 45(m)(1)(A), 53(b), 1681s, and 1692/.

3. Venue is proper in the United States District Court for the District of Oregon under 28 U.S.C. §§ 1391(b)-(c), 1395(a), and 15 U.S.C. § 53(b).

## PLAINTIFF

4. This action is brought by the Plaintiff, Terence M Kearney, a natural person who's mailing address is in the City of Scappoose, County of Columbia, State of Oregon and is a "consumer" as that term is defined by 15 U.S.C. § 1692a(3). Plaintiff requests interdiction of the Federal Trade Commission with United States Government given statutory authority and responsibility by the FTC Act, 15 US.C. §§ 41-58 to act in it's behalf. The Federal Trade Commission (FTC) is charged, *inter alia,* with enforcing Section 5(a) of the FTC Act,15 U.S.C. § 45(a), which prohibits unfair or deceptive acts or practices in or affecting commerce; the FCRA, 15 U.S.C. §§ 1681-1681x, which imposes duties upon consumer reporting agencies and those who furnish information to a consumer reporting agency or use information obtained from a consumer reporting agency; and the FDCPA, 15 U.S.C. §§ I692-1692p, which imposes duties upon debt collectors.

Terence M Kearney v. Asset Acceptance, LLC Complaint for unlawful Debt Collection Violations

## DEFENDANT

5. Asset Acceptance, LLC ("Asset," or "Asset Acceptance"), is a Delaware Limited Liability Company with its principal place of business located at 28405 Van Dyke Avenue, Warren, Michigan 48903. It operates four call centers, one of which is located at 2840 South Falkenburg Road, Riverview, Florida 33578. Asset Acceptance is a wholly-owned subsidiary of Asset Acceptance Capital Corp. At all times relevant to this Complaint, Asset Acceptance has transacted business in this District.

6. Asset Acceptance is a "debt collector" as defined in Section 803(6) of the FDCPA 15 U.S.C. § 1692a (6). As part of its debt collection activities, Asset Acceptance furnishes information to consumer reporting agencies. As such, Asset Acceptance is a person or entity subject to Section 623 of the FCRA, 15 U .S.C. § 1681s-2, which imposes a series of duties and prohibitions upon any person or entity that furnishes information to a consumer reporting agency.

7. The term "consumer" as used in this Complaint means any natural person obligated or allegedly obligated to pay any debt, as "debt" is defined in Section 803(5) of the FDCPA, 15 U.S.C. § 1692a(5).

## COMMERCE

8. At all times material to this Complaint, Asset Acceptance has maintained a substantial course of trade in or affecting commerce, as "commerce" is defined in Section 4 of the FTC Act, 15 U.S.C. § 44.

## DEFENDANT'S BUSINESS PRACTICES
### Background on Defendant's Collection Practices

9. Colloquially known as a "debt buyer," Asset Acceptance purchases and collects on portfolios of charged-off consumer debts from credit originators such as

credit card issuers, consumer finance companies, health clubs, and telecommunications and utilities providers. As of September 30, 2010, Asset Acceptance held more than 34 million individual accounts with an original value of more than $42 billion, purchased for an aggregate of 2.54% of face value.

10. Asset Acceptance specializes in purchasing and collecting on portfolios of older accounts that have previously been placed with one or more third party collectors and are more than 360 days past due. Its strategy for successful collection of such debts includes pursuing consumers for ten years or longer.

11. Asset typically receives the portfolio account data from sellers in electronic databases. Although the data provided varies by portfolio, it typically includes the consumer account holder's name, last known address and telephone number, the account number and balance (including any interest and fees), the last payment date and/or the charge off date, and, if known, the account holder's Social Security number. Some portfolios may include a significant number of accounts with no Social Security numbers, while other portfolios may include a significant number of accounts with inaccurate addresses. The portfolio account data does not include account documents such as contracts signed by the consumer or monthly billing statements.

12. Asset Acceptance's contracts with portfolio sellers include representations and warranties regarding the validity and integrity of the account information it purchases. Such representations and warranties vary with the portfolio seller and the portfolio purchased. In some instances, however, the contracts specifically disclaim the warranties about the accuracy of the account data. For example, a contract to purchase debts from a major national retailer contains the following disclaimer: "Seller has not represented, warranted, or covenanted the number, nature, accuracy, completeness, enforceability or validity of any account or accounts information." In other instances, contracts may warrant the accuracy of only certain information or specify that some of the data may be inaccurate (e.g., contracts for certain telecommunications portfolios stating that the addresses in the account data may not be correct).

13. Individual account documents such as credit applications and account statements that may substantiate the portfolio's data do not exist for some portfolios or for some accounts within a portfolio. Documents are less likely to be available for accounts in portfolios of older debt, portfolios from credit originators that have gone out of business, or portfolios purchased from other debt buyers (as distinguished from credit originators). Asset advises its collectors that documents are likely unavailable for accounts with charged-off dates older than seven years.

14. Although Asset does not usually choose to acquire account documents with a portfolio purchase, Asset's contracts with credit originators allow Asset to order a small number or percentage of available documents for free for a short period of time. After that, Asset must pay the portfolio's seller for additional account documents, if they are available. That document fee can range from $5 to as much as $55 per item. It can take as long as three to six months for Asset to receive documents ordered from a credit originator.

15. After purchasing a portfolio, Asset loads the new portfolio's data into its collection system, updates consumers' address information by cross-referencing account data with a national change-of-address database, sends initial collection notices to consumers, and reports eligible accounts to the national consumer reporting agencies. Thirty days after sending the initial notice to consumers, Asset assigns accounts to account representatives who attempt to collect the debts by contacting consumers directly by telephone. Through available commercial databases, including credit reporting databases, Asset routinely obtains new address and contact information about consumers it cannot locate (this process is known as "skip-tracing").

16. Asset's electronic collection system provides account representatives with information about the debt, including the charge-off date, whether account documents are available, and, if so, whether they are in-house or must be ordered from the creditor. The system also indicates whether Asset has determined that the debt is past the statute of limitations. Asset trains its account representatives to document in its

electronic system each contact, or attempted contact, with a consumer. Defendant's Notice to Consumers of Reporting Negative Information to Consumer Reporting Agencies

17. The initial collection notice Asset sends to consumers typically discloses that Asset may report information about the consumer to consumer reporting agencies. Section 623(a)(7) of the FCRA requires that this disclosure be provided to consumer no later than thirty days after Asset reports negative information about the consumer to a consumer reporting agency.

18. Some initial collection notices with the required FCRA disclosure are returned to Asset as undeliverable. In numerous instances, these notices are not re-mailed to consumers. As a result, in numerous instances consumers whose initial collection notices are returned to Asset do not receive the disclosure required by Section 623(a)(7) of the FCRA.

19. Many consumers who do not receive the initial disclosure from Asset are unaware that Asset is furnishing negative information about them to consumer reporting agencies. Notice of the debt and that Asset is reporting it is particularly important when debt buyers like Asset are involved. Because Asset purchased the consumers' debt after it was in default, consumers have no idea who Asset is or that they allegedly owe Asset any money. Additionally, where Asset purchases older debt, consumers are less likely to know about or remember a defaulted obligation, especially if the debt has not previously been reported to a consumer reporting agency. Moreover, where Asset has identified the wrong person as the account holder, either because of errors in the original data or because of inaccuracies introduced through skip-tracing, consumers who do not receive the initial disclosure have no idea that negative information is being reported about them.

20. Some consumers who do not receive an initial notice from Asset first learn that the alleged debt appears on their credit report when they apply for new credit, such as a mortgage or auto loan. In order to obtain credit, some consumers who question the

validity of the debt may pay it, even if they believe they do not owe it, because disputing the debt can be a lengthy process without guaranteed results. Other consumers may pay higher interest rates or fees for credit, or may be denied credit.

## Defendant's Handling of Written Disputes Sent Within 30 Days of the Initial Notice

21. The initial collection notice sent to consumers by Asset includes the name of the original creditor, the original account number, and the balance past due. Asset uses the information loaded into its collection system to generate the initial collection notice.

22. Some consumers who receive an initial collection notice from Asset send Asset, within thirty days of receipt of Asset's initial communication, a written notice disputing the debt. Section 809(b) of the FDCPA requires that debt collectors who receive such a written dispute cease collecting the debt "until the debt collector obtains verification of the debt" and mails the verification to the consumer. Asset temporarily stops collection action on the debt after it receives such a dispute.

23. Asset sends consumers who dispute the debt as described in Section 809(b) of the FDCPA a form letter stating, "Enclosed please find an account statement prepared with information provided to us by the prior creditor." Attached to the form letter is a form document titled "debt validation." Asset generates the information in the form from the portfolio data it purchased and loaded into its collection system - the same information that was the basis for the initial collection notice. The debt validation form includes the name of the original creditor, the original account number, and the balance past due, as well as the consumer's name, address and the last four digits of his or her Social Security number. Asset resumes collection activity on the debt once the form letter is mailed to the consumer.

24. Asset sends the debt validation form to consumers who dispute the validity of the debt regardless of the nature or specifics of the consumer's dispute. In most cases, Asset does not obtain additional information about the debt from the original creditor or any other source or take other steps to reasonably investigate the consumer's dispute

providing the consumer with the same information from the same database is not
obtaining "verification of the debt" for purposes of Section 809 of the FDCPA.

## Defendant's Repeated Calls to Third Parties.

25. In the course of attempting to collect a debt in numerous instances Asset
collectors telephone individuals who are not the consumers who allegedly owe the
debts that Asset is attempting to collect. Asset identifies these wrong parties' phone
numbers either because the original account data Asset purchased is outdated and
inaccurate, or because the skip-tracing databases it uses to update consumer
information are inaccurate.

26. In numerous instances, individuals who repeatedly received such erroneous
phone calls have complained to Asset about these calls and have informed Asset that
the phone number does not belong to the debtor that Asset is seeking.

27. Even after the individual wrongly called has told Asset that it has called the
wrong party, in numerous instances, Asset calls the individual repeatedly. In these calls,
Asset has represented that the person called owes the debt or has information
concerning the person who actually owes the debt, even though that is not the case.
Asset's electronic collection system has allowed such wrong party calls even after the
collector has marked the phone number as incorrect.

28. Having received notice that it has contacted the wrong party, Asset has no
reasonable basis to call that telephone number again unless and until it possesses
additional information showing that the telephone number belongs to the consumer who
allegedly owes the debt or to a person it has reason to believe possesses location
information about that consumer.

29. In other instances, Asset collectors have called the same third party multiple
times to request location information about a consumer. In some cases, these calls
have been made to individuals whom Asset believed were the consumer's family
members or friends. In other cases, the calls were to wrong parties who did not know

the consumer at all. Asset makes such calls even though the third party has not requested additional calls, and it is not reasonable for Asset to believe that the third party's earlier response was erroneous or incomplete or that the third party has correct or complete location information that he or she previously did not have.

## Defendant's Practices When Collecting Debts Beyond the Statute of Limitations

30. Because Asset Acceptance regularly collects older debt, and because its business strategy includes holding the debt it purchases for several years, a large percentage of the individual accounts it collects are past the statute of limitations.

31. The statute of limitations for any given debt can vary from as short as two to three years to as long as fifteen or more years, and depends on several factors, including the date that the debt was last paid or went into default, the law governing the limitations period for the type of debt (e.g., telecommunications, credit card, health club, etc.), whether the debt is based on an oral or written contract, and whether the debt is the result of a judgment. A debt that is past the statute of limitations can be revived in many states if the consumer either makes a payment on the debt or states, in writing, an intention to pay it.

32. A past-statute debt remains a valid obligation owed by the consumer in every state except Mississippi and Wisconsin. Consumers, however, have a dispositive affirmative defense to any legal action initiated to collect a past statute debt.

33. Asset tracks the date that it believes any given account will go past the statute of limitations. Collectors are trained how to collect past-statute debts, and are taught that the debt will be revived if the consumer makes a partial payment on such a debt. When a consumer cannot pay a debt in full, but can pay something, Asset will enter into a payment plan with that consumer.

34. Many consumers do not know if the accounts that Asset is attempting to collect are beyond the statute of limitations. Consumers also do not realize that making a partial payment on a debt, or making a written promise to pay will, in many instances,

revive the debt. When Asset contacts consumers to collect on a debt, many consumers believe they could experience serious negative consequences, including being sued, if they fail to pay the debt. Similarly, many consumers believe that making a partial payment on a debt in response to Asset's collection efforts is a positive action that can avert the negative consequences of nonpayment. If consumers knew, in connection with a past-statute debt, that Asset had no legal means to enforce collection of the debt, or understood that making a partial payment or a written promise to pay would revive it, some consumers would likely choose not to make a payment or a written promise to pay.

### Defendant's Handling of Consumer Disputes

35. Asset Acceptance routinely receives written and telephonic complaints from consumers who state they do not owe the debt that Asset Acceptance is attempting to collect. Complaints include claims that the debt that Asset seeks to collect does not belong to the individual that Asset has contacted, that the debt is the result of fraud or identity theft, or that the debt has already been paid.

36. Notwithstanding the nature of the consumer's dispute, Asset typically requires disputing consumers to provide evidence substantiating claims that they do not owe the debt. For example, in numerous instances Asset requires consumers who claim that a debt is not theirs to send in a police report or a notarized affidavit swearing that the debt was the result of fraud. These consumers, who in many instances have simply been wrongly identified as debtors by Asset, may have no reason to believe that they are victims of fraud or identity theft, and are likely unwilling or unable to secure a police report or sign a sworn statement claiming otherwise.

37. Even consumers who do claim that the debt is the result of fraud or identity theft may be unable to provide a police report or a notarized statement, especially if the debt is very old or the fraud occurred elsewhere. Police may be unwilling to take a report regarding fraudulent reporting of debts that are many years old or originated out of state, and many consumers cannot freely or easily obtain a notary's services.

Similarly, consumers who assert that they previously paid a debt may not be able to provide Asset with a cancelled check or a "payment in full" letter, especially if the alleged debt is many years old and records have been lost or destroyed. If consumers do not provide the requested documentation, Asset considers the dispute resolved and resumes its collection efforts.

38. Asset does not take independent steps to verify the accuracy of disputed account information. Even when the original creditor has documents available, Asset does not routinely purchase them. And even when such documents have been purchased and are available for collectors to review, in numerous instances collectors do not review the documents during the course of a typical collection call. Collectors are expected or strongly encouraged to make at least 200 collection calls every day, leaving them with limited time and incentive to respond to specific consumer disputes and review scanned images of account documents.

39. Additionally, in numerous instances, collectors do not routinely review the original account data to see if account information such as the consumer's Social Security number, address or telephone number was obtained from the original creditor or merely updated via commercial databases. The information obtained from these databases is not always accurate or current. Individuals with names the same as or similar to debtors in Asset's database may be wrongly identified or individuals whose phone numbers or addresses were previously associated with one of Asset's debtors may be wrongly targeted. These individuals are erroneously subjected to collection efforts.

40. When Asset continues to collect on debts disputed by consumers without adequately investigating the consumers' disputes, it lacks a reasonable basis for such continued collection. In many instances consumers are harmed by Asset's ongoing collection efforts on debts that they do not owe. These consumers suffer impaired credit, ongoing collection calls, and even lawsuits.

## Defendant's Handling of Disputes Received from Consumer Reporting Agencies

41. Asset Acceptance regularly and in the ordinary course of business furnishes information about its transactions or experiences with its consumers to one or more consumer reporting agencies.

42. In numerous instances, consumers have notified consumer reporting agencies that Asset-related account information appearing on their credit reports is wrong. The consumer reporting agencies forward Asset Acceptance most such disputes in an electronic format, through automated consumer dispute verification ("ACDV") forms. Asset receives more than 500,000 ACDVs each year.

43. Pursuant to Section 623(b)(l) of the FCRA, Asset Acceptance, as a furnisher of information to consumer reporting agencies, is required to conduct a reasonable investigation of the disputed account information upon receipt of an ACDV from a consumer reporting agency.

44. Asset processes many ACDVs through "batch processing," an automated system in which certain "identifiers" in Asset's electronic account records are automatically compared with the information provided on the ACDV forms. When the Social Security number and consumer name on the ACDV match the information in Asset's database, Asset reports to the consumer reporting agency that it has verified the disputed information. In addition, many ACDVs that are batch processed have more information about the consumers written disputes to the consumer reporting agencies in a generalized "comments" field. Asset does not review these comments for ACDVs that it batch processes.

45. The batching process of comparing a consumer's name and Social Security number often does not adequately respond to the consumer's dispute and is not a reasonable investigation. Because Asset originally reported the consumer's name and Social Security number to the consumer reporting agencies, in numerous instances these identifiers match. Asset does not investigate the particular merits of the consumer's claim by, for example, reviewing individual account documents, contacting

the original portfolio seller to verify the accuracy of the information, asking the consumer reporting agency for more information, or reviewing its own internal notes.

46. Asset ACDV "specialists" individually review some ACDV disputes, including some classified by the consumer reporting agencies as involving claims of fraud, identity theft, or "paid prior." Such individual review is limited, since Asset employs only 14 to 20 ACDV specialists and expects them to process at least 18-20 ACDVs per hour.

47. To investigate some ACDV disputes classified by consumer reporting agencies as involving fraud or identity theft allegations, Asset sends a letter to the consumer requesting proof of fraud or identity theft. Similarly, Asset may seek to investigate some consumer disputes by reviewing account documents. If such documentation is not available internally, Asset may try to order documents from the original creditor. When available, it can take up to six months for Asset to obtain the requested documents. Likewise, in numerous instances, it can take several weeks for Asset to receive and review documents it requested from consumers. In these circumstances, Asset is unable to complete its investigation in the time allowed for investigations by Sections 623(b)(2) and 611(a)(1) of the FCRA. For these ACDVs, Asset marks the negative information as disputed but continues to report it. Because Asset has not completed its investigation and therefore cannot at that time reasonably verify the information it reported to the CRA, Section 623(b)(I)(E) of the FCRA requires that Asset modify, delete, or permanently block the information.

48. Consumers are harmed by Asset's inadequate investigation of ACDV disputes. Many consumers have been denied credit or charged higher rates or fees for credit because Asset continues to report inaccurate negative information to their credit files.

### Portfolios with Suspect Account Data

49. Asset relies on the credit originator's contractual representations and warranties about the accuracy and validity of the account data it purchases when it initiates collection on new portfolios. In some instances, however, Asset learns that an

acquired portfolio contains a significant amount of unreliable account data. For example, Asset may learn that some portfolios have inaccurate Social Security numbers or other faulty data that leads to the mistaken identification of debtors. In other instances, a pattern of similar consumer disputes regarding accounts within a particular portfolio alerts Asset to potential problems with the business practices of the original creditor and the validity of the credit agreement establishing the debt. In addition, some portfolios may be missing Social Security numbers, addresses, or other identification information, causing Asset to augment the data it received from the portfolio seller with information from commercially available databases. In these instances, it is not reasonable for Asset to continue to rely solely on the creditor's contractual representations and warranties about the accuracy of the account data.

50. In particular, Asset has reason to doubt the reliability of some account data purchased from Bally Total Fitness. Many Bally accounts lack Social Security numbers or include incorrect Social Security numbers. Many consumers have disputed Bally's debts that Asset attempts to collect, claiming that Asset is dunning the wrong person, or that they did not agree to contract with Bally for a monthly service, but rather signed up for a free trial membership or cancelled the contract. This pattern of incomplete or erroneous data coupled with numerous disputes calls into question the validity of the account information on which Asset relies to collect these debts.

51. Asset's policies and practices regarding Bally portfolios show that Asset is aware that collecting these accounts without additional substantiation may be problematic. Asset collectors receive special training on handling certain Bally disputes. Moreover, Bally accounts are handled differently from other debts. For example, when Asset collectors call consumers about Bally accounts, the collectors have greater discretion to accept lower payments as satisfaction of the debt than would be sufficient to satisfy other types of debts.

52. Where, as in the case of collections for Bally accounts, Asset has reason to know that the initial account data purchased from a creditor is unreliable in numerous instances; Asset lacks a reasonable basis to rely solely on the original creditor's contractual warranties of accuracy when it represents to consumers that they owe debts for such accounts.

## SECTION 5 OF THE FTC ACT

53. Section 5(a) of the FTC Act, 15 U.S.C. § 45(a), prohibits "unfair or deceptive acts or practices in or affecting commerce." Misrepresentations or deceptive omissions of material fact constitute deceptive acts or practices prohibited by Section 5(a) of the FTC Act.

## OREGON'S UNLAWFUL DEBT COLLECTION PRACTICES ACT

54. The UDCPA mirrors another section of federal consumer-protection statutory scheme, the Fair Debt Collection Practices Act, which prohibits much of the same conduct under federal law. See 15 U.S.C. § 1692d.

55. Oregon enacted the UDCPA to prohibit debt collectors from using specific abusive practices. See Or.Rev.Stat. § 646.639(2) (stating that "[i]t shall be an unlawful collection practice for a debt collector, while collecting or attempting to collect a debt" to undertake actions such as to "threaten the use of force or violence," "[t]hreaten arrest or criminal prosecution," or "[u]se profane, obscene or abusive language in communicating with a debtor").[1] Specifically, Oregon Revised Statutes § 646.639(2)(k) prohibits a debt collector from "[a]ttempt[ing] to or threaten[ing] to enforce a right or remedy with knowledge or reason to know that the right or remedy does not exist."

## VIOLATIONS OF SECTION 5 OF THE FTC ACT

### COUNT I

### Lack of Reasonable Basis

56. In numerous instances, through the means described in Paragraphs 9-52, in connection with collecting or attempting to collect debts from consumers, Asset Acceptance has represented to consumers, directly or indirectly, expressly or by implication, that the debts are valid and that consumers have an obligation to pay the debts, including but not limited to circumstances where:

- a. The consumer has disputed the validity or accuracy of the alleged debt and Asset failed to review information substantiating the accuracy of the debt or the identity of the debtor prior to continuing collection on that account; or

- b. Asset has reason to believe that a specific portfolio of accounts contained unreliable data and failed to obtain and review information substantiating the accuracy of individual account data prior to collecting or attempting to collect on individual accounts in that portfolio.

57. In truth and in fact, the material representations set forth in Paragraph 56 are false or misleading, or Asset Acceptance did not have a reasonable basis for the representations at the time the representations were made. Therefore, the representations set forth in Paragraph 56 are false or misleading and constitute deceptive acts or practices in violation of Section 5(a) of the FTC Act, 15 U.S.C. § 45(a).

### COUNT II

### Failure to Disclose

58. In numerous instances, through the means described in Paragraphs 9-52, in connection with collecting or attempting to collect debts from consumers, Asset Acceptance has demanded that consumers pay, in full or in part, debts that are beyond

the statute of limitations. By demanding that consumers pay these debts, Asset has represented, expressly or by implication, that consumers owe these debts in the amounts demanded.

59. Asset Acceptance has failed to disclose, or failed to disclose adequately, that, in many instances, (a) it cannot require through a lawsuit that consumers pay debts beyond the statute of limitations, and (b) if consumers make partial payments on these debts, the statute of limitations period will be renewed and Asset could again require through a lawsuit that consumers pay the total outstanding amount of these debts. These facts would be material to consumers in deciding whether to pay these debts in full or in part.

60. Asset's failure to disclose the material information described in Paragraph 57, in light of the representations and practices in Paragraph 56, constitutes a deceptive act or practice in violation of Section 5(a) of the FTC Act, 15 U.S.C. § 45(a).

## THE FAIR CREDIT REPORTING ACT

61. The FCRA was enacted in 1970 and became effective on April 25, 1971, and has been in force since that date. In 1996, the FCRA was amended extensively by Congress. Among other things, Congress added Section 623 of the Act, which became effective on October 1, 1997.

62. Section 621 of the FCRA, 15 U.S.C. § 1681s, authorizes the Commission to use all of its functions and powers under the FTC Act to enforce compliance with the FCRA by all persons subject thereto except to the extent that enforcement specifically is committed to some other governmental agency, irrespective of whether the person is engaged in commerce or meets any other jurisdictional tests set forth by the FTC Act.

63. For purposes of Section 623(a)(7) of the FCRA, 15 U.S.C. § 1681s-2(a)(7), "negative information" means "information concerning a customer's delinquencies, late

payments, insolvency, or any form of default," 15 U.S.C. § 1681s-2(a)(7)(G)(i), and the terms "financial institution" and "customer" have the same meanings as in Section 509 Public Law 106-102, 15 U.S.C. § 6809(3). 15 U.S.C. § 1681s-2(a)(7)(G)(ii).

## VIOLATIONS OF THE FAIR CREDIT REPORTING ACT
## COUNT III
### Violations of Section 623(a)C1)(A)

64. Section 623(a)(1)(A) of the FCRA prohibits furnishers of information to consumer reporting agencies from furnishing any information relating to a consumer to any consumer reporting agency if the furnisher knows or has reasonable cause to believe that the information is inaccurate. 15 U.S.C. § 1681s-2(a)(l)(A).

65. In numerous instances, through the means described in Paragraphs 9-52, in connection with furnishing information relating to a consumer to a consumer reporting agency, Asset Acceptance has furnished such information while knowing or having reasonable cause to believe that the information was inaccurate.

66. The acts and practices alleged in Paragraph 65 constitute violations of Section 623(a)(l)(A) of the FCRA, 15 U.S.C. §168ls-2(a)(l)(A). Pursuant to Section 621(a)(1) of the FCRA, 15 U.S.C. § 1681s(a)(l), the acts and practices alleged in Paragraph 65 also constitute unfair or deceptive acts or practices in violation of Section 5(a) of the FTC Act, 15 U.S.C. § 45(a).

## COUNT IV
### Violations of Section 623(a)(7)

67. Section 623(a)(7) of the FCRA requires that, if any financial institution that extends credit to customers and regularly and in the ordinary course of business furnishes information to a consumer reporting agency furnishes negative information about a customer to a consumer reporting agency, the financial institution shall provide the customer with a clear and conspicuous written notice about the furnishing of such

negative information no later than thirty days after the financial institution furnishes the negative information to the consumer reporting agency. 15 U.S.C. § 1681s-2(a)(7).

68. Asset Acceptance is a "financial institution" with "customers" as defined by Section 623(a)(7)(G)(ii) of the FCRA, 15 U.S.C. § 1681s-2(a)(7)(G)(ii).

69. Asset Acceptance furnishes "negative information" about its customers regarding credit extended to customers to consumer reporting agencies as "negative information" is defined in Section 623(a)(7)(G)(i) of the FCRA, 15 U.S.C. § 1681s-2(a)(7)(G)(i).

70. In numerous instances, through the means described in Paragraphs 9-52, in connection with the furnishing of negative information about its customers to consumer reporting agencies, Asset Acceptance has failed to provide its customers with the written notice required by Section 623(a)(7) no later than thirty days after furnishing the negative information to the consumer reporting agency.

71. The acts and practices alleged in Paragraphs 69-70 constitute violations of Section 623(a)(7) of the FCRA, 15 U.S.C. §1681s-2(a)(7). Pursuant to Section 621(a)(l) of the 15 U.S.C. §§ FCRA, 15 U.S.C. § 1681s(a)(l), the acts and practices alleged in Paragraphs 69-70 also constitute unfair or deceptive acts or practices in violation of Section 5(a) of the FTC Act, 15 U.S.C. § 45(a).

## COUNT V

## Violations of Section 623(b)( 1)

72. Section 623(b) of the FCRA requires furnishers of information to consumer reporting agencies to conduct a reasonable investigation when the furnisher receives a notice of dispute regarding the completeness or accuracy of the reported information from a consumer reporting agency in accordance with the provisions of Section 611(a)(2) of the FCRA, 15 U.S.C. § 1681 i, and to report the results of the investigation to the consumer reporting agency. 15 U.S.C. § 1681s-2(b).

73. In numerous instances, through the means described in Paragraphs 9-52, Asset Acceptance does not conduct a reasonable investigation, or any investigation, when it receives a notice of dispute from a consumer reporting agency.

74. The acts and practices alleged in Paragraph 73 constitute violations of Section 623(b) of the FCRA, 16 U.S.C. § 1681s-2(b). Pursuant to Section 621 (a)(l) of the FCRA, 15 U.S.C. § 1681s(a)(l), the acts and practices alleged in Paragraph 73 also constitute unfair acts or practices in violation of Section 5(a) of the FTC Act, 15 U.S.C. § 45(a).

## FAIR DEBT COLLECTION PRACTICES ACT

75. In 1977, Congress passed the FDCPA, 15 U.S.C. §§ 1692-1692p, which became effective on March 20, 1978, and has been in force since that date. Section 814 of the FDCPA, 15 U.S.C. § 1692/, authorizes the Commission to use all of its functions and powers under the FTC Act to enforce compliance with the FDCPA by any debt collector, irrespective of whether that debt collector is engaged in commerce or meets any other jurisdictional tests set by the FTC Act. The authority of the Commission in this regard includes the power to enforce the provisions of the FDCPA in the same manner as if the violations of the FDCPA were violations of a Federal Trade Commission trade regulation rule.

76. Section 803(7) of the FDCPA defines the term "location information" as meaning a consumer's place of abode and the consumer's telephone number at such place, or the consumer's place of employment. 15 U.S.C. § 1692a(7).

## VIOLATIONS OF THE FAIR DEBT COLLECTION PRACTICES ACT
## COUNT VI

### Violations of Section 804

77. Section 804 of the FDCPA, 15 U.S.C. § 1692b, governs the manner in which debt collectors may communicate with any person other than the consumer for purposes of acquiring location information about the consumer. Section 804(3) prohibits

debt collectors from communicating with any person about a consumer more than once unless requested by the person or unless the debt collector reasonably believes that the earlier response of such person is erroneous or incomplete and that such person now has correct or complete information.

78. In numerous instances, through the means described in Paragraphs 9-52, in connection with the collection of debts, Asset Acceptance, directly or indirectly, has communicated more than once with persons other than the consumer for the purpose of obtaining location information about the consumer without a reasonable belief that the earlier response of the person was erroneous or incomplete and the person then had correct or complete location information.

79. The acts and practices alleged in Paragraph 78 constitute violations of Section 804(3) of the FDCPA, 15 U.S.C. § 1692b(3). Pursuant to Section 814(a) of the FDCPA, 15 U.S.C. § 16921(a), the acts and practices alleged in Paragraph 78 also constitute unfair or deceptive acts or practices in violation of Section 5(a) of the FTC Act, 15 U.S.C. § 45(a).

## COUNT VII

### Violations of Section 805

80. Section 805 of the FDCPA, 15 U.S.C. § 1692c, governs communications in connection with debt collection generally. Section 805(b) specifically prohibits communications about a debt with any person other than the consumer, a consumer reporting agency, the creditor, or their attorneys except as allowed by Section 804 or with the permission of the consumer, or a court of competent jurisdiction, or as reasonably necessary to effectuate post judgment relief.

81. In numerous instances, through the means described in Paragraphs 9-52, in connection with the collection of debts, Asset Acceptance, directly or indirectly, has communicated about a debt with persons other than the consumer, a consumer reporting agency, the creditor, or their attorneys without the permission of the consumer, or as otherwise allowed by Section 804.

82. The acts and practices alleged in Paragraph 81 constitute violations of Section 805(b) of the FDCPA, 15 U.S.C. § 1692c(b). Pursuant to Section 814(a) of the FDCPA, 15 U.S.C. § 16921(a), the acts and practices alleged in Paragraph 81 also constitute unfair or deceptive acts or practices in violation of Section 5(a) of the FTC Act, 15 U.S.C. § 45(a).

## COUNT VIII

### Violations of Section 807

83. Section 807 of the FDCPA, 15 U.S.C. § 1692e, prohibits debt collectors from using any false, deceptive, or misleading representation or means in connection with the collection of any debt. Section 807(2)(A), 15 U.S.C. § 1692e(2)(A), specifically prohibits the false representation of the character, amount, or legal status of any debt, while Section 807(8), 15 U.S.C. § 1692e(8), prohibits communicating or threatening to communicate to any person credit information which is known or which should be known to be false, including the failure to communicate that a disputed debt is disputed, and Section 807(10), 16 U.S.C. 1692(e)(10), prohibits using false representations or deceptive means to collect or attempt to collect any debt or to obtain information concerning a consumer.

84. In numerous instances, through the means described in Paragraphs 9-52, in connection with the collection of debts, Asset Acceptance, directly or indirectly, has used false, deceptive, or misleading representations or means, in violation of Section 807 of the FDCPA, 15 U.S.C. § 1692e, including, but not limited to, the following:

a. In numerous instances, Asset Acceptance, directly or indirectly, has used false representations concerning the character, amount, or legal status of a debt, in violation of Section 807(2)(A) of the FDCPA, 15 U.S.C. § 1692e(2)(A);

b. In numerous instances, Asset Acceptance, directly or indirectly, has communicated credit information to consumer reporting agencies that it knew, or should have known, to be false, in violation of

Section 807(8) of the FDCPA, 15 U.S.C. § 1692e(8); and

c. In numerous instances, Asset Acceptance, directly or indirectly, has used false representations or deceptive means to collect or attempt to collect any debt or to obtain information concerning a consumer in violation of Section 807(10) of the FDCPA, 15 U.S.C. § 1692e(10).

85. The acts and practices alleged in Paragraph 84 constitute violations of Section 807 of the FDCPA, 15 U.S.C. § 1692e. Pursuant to Section 814(a) of the FDCPA, 15 U.S.C. § 16921(a), the acts and practices alleged in Paragraph 84 also constitute unfair or deceptive acts or practices in violation of Section 5(a) of the FTC Act, 15 U.S.C. § 45(a).

## COUNT IX

### Violations of Section 809

86. Section 809(b) of the FDCPA, 15 U.S.C. § 1692g (b), provides, *inter alia,* that if a consumer notifies a debt collector in writing, within thirty days of the consumer's receipt of the initial communication from the debt collector, that the debt is disputed, the debt collector shall cease collection of the debt until the debt collector obtains and provides verification of the debt to the consumer.

87. In numerous instances, through the means described in Paragraphs 9-52, in connection with the collection of debts, when a consumer has notified Asset Acceptance, in writing within the thirty-day period described in Section 809(a) of the FDCPA, 15 U.S.C. § 1692g (a), that the debt, or a portion thereof, is disputed, Asset has failed to obtain and provide verification of the debt to the consumer and has continued to attempt to collect the debt.

88. The acts and practices alleged in Paragraph 87 constitute violations of Section 809(b) of the FDCPA, 15 U.S.C. §1692g (b). Pursuant to Section 814(a) of the FDCPA, 15 U.S.C. § 16921(a), the acts and practices alleged in Paragraph 87 also constitute unfair or deceptive acts or practices in violation of Section 5(a) of the FTC Act, 15 U.S.C. § 45(a).

### COUNT X.

#### Intentional Infliction of Emotional Distress

90. The Defendants intended to and did inflict severe emotional distress upon Plaintiff by engaging in actions that intended to harass, belittle, confuse, mislead and threaten the Plaintiff, the purpose of which was to intimidate and coerce the Plaintiff into paying a debt which was not legitimately owed, and conspired to systematically deny the Plaintiff his right to dispute the legitimacy and validity of a claimed debt.

91. The Defendants attempted to take advantage of a consumer reasonably unable to protect his interests because of an assumed ignorance and an inability to understand the legal issues and other factors involved, and therefore acted with unconscionable intent.

### INJUNCTION FOR VIOLATIONS OF THE FTC ACT, FCRA, AND FDCPA

92. Under Section 13(b) of the FTC Act, 15 U.S.C. § 53(b), this Court is authorized to issue a permanent injunction to ensure that Asset Acceptance will not continue to violate the FTC Act, the FCRA, and the FDCPA.

### EQUITABLE RELIEF FOR VIOLATIONS OF THE FTC ACT, FCRA, AND FDCPA

93. Under Section 13(b) of the FTC Act, 15 U.S.C. § 53(b), this Court is requested to issue all equitable and ancillary relief as it may deem appropriate in the enforcement of the FTC Act, the FCRA, and the FDCPA, and the Oregon UDCPA including the ability to order rescission or reformation of contracts, restitution, the refund of monies paid, and disgorgement to deprive a wrongdoer of ill-gotten gain.

### CIVIL PENALTIES FOR VIOLATIONS OF THE FCRA

94. Section 621 (a)(2)(A) of the FCRA, 15 U.S.C. § 1681s(a)(2)(A), authorizes the Court to award monetary civil penalties in the event of a knowing violation, which constitutes a pattern or practice of violations. Asset Acceptance's violations of Sections

623(a)(7) and 623(b) of the FCRA, as alleged in this Complaint, were knowing and constituted a pattern or practice of violations. As specified by the Federal Civil Penalty Inflation Adjustment Act of 1990,28 U.S.C. § 2861, as amended, the Court is authorized to award a penalty of not more than $2,500 per violation for violations occurring before February 10, 2009, and $3,500 per violation for violations occurring on or after that date.

95. Each instance in which Asset Acceptance has failed to comply with the FCRA in one or more of the ways described above constitutes a separate violation of the FCRA for the purpose of assessing monetary civil penalties under section 621 of the FCRA. Plaintiff seeks monetary civil penalties for every separate violation of the FCRA.

## CIVIL PENALTIES FOR VIOLATIONS OF THE FDCPA

96. Section 5(m)(1)(A) of the FTC Act, 15 U.S.C. § 45(m)(l)(A), and Section 814(a) of the FDCPA, 15 U.S.C. § 16921, authorize the Court to award monetary civil penalties for violations of the FDCPA when such violations were committed with actual knowledge or knowledge fairly implied on the basis of objective circumstances as set forth in Section 5(m)(l)(A) of the FTC Act, 15 U.S.C. § 45(m)(l)(A). Asset Acceptance's violations of the FDCPA, as alleged in this Complaint, were made with actual knowledge or knowledge fairly implied on the basis of objective circumstances. As specified by the Federal Civil Penalty Inflation Adjustment Act of 1990,28 U.S.C. § 2861, as amended, the Court is requested to award a penalty of not more than $11,000 for each violation of the FDCPA before February 10, 2009, and not more than $16,000 for each violation of the FDCPA after that date.

97. Each instance in which Asset Acceptance has failed to comply with the FDCPA in one or more of the ways described above constitutes a separate violation of the FDCPA for the purpose of assessing monetary civil penalties. Plaintiff seeks monetary civil penalties for every separate violation of the FDCPA.

## CIVIL PENALTIES FOR VIOLATIONS OF THE UDCPA

98. The **FDCPA** prohibits debt collectors from communicating about a debt with any person other than the debtor. 15 U.S.C. § 1692c (b). The **UDCPA** prohibits a debt collector from communicating with third parties concerning a debt and from communicating with the debtor at his place of employment without the debtor's permission. Or. Rev. Stat. §§ 646.639(2)(f), (g). The uncontested record establishes Defendant violated these statutory provisions when it communicated with Plaintiff's Marina Manager at his moorage and communicated with other parties at Plaintiff's Previous Marina without Plaintiff's permission.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiff, pursuant to 15 U.S.C. §§ 45(m)(1)(A), 53(b), 1692/, 1681s, and the Court's own equitable powers, respectfully prays that judgment in a sum less than $150,000 be entered against the Defendant for the following:

1. Declaratory judgment that Defendant's conduct violated the FDCPA, and declaratory and injunctive relief against the Defendant;

2. For ignoring previous injunctions for same violations demand that David DeBlasio OSB 74075, and Chris O'Neill OSB 93387, attorney's for Asset Acceptance, be each fined $10,000.00 payable to the OSB Client Security Fund.

3. For Defendant's violations of the FTC Act, the FCRA, the UDCPA and the FDCPA, and the disgorgement of ill-gotten gains award Plaintiff monetary civil penalties for each violation of the FDCPA ,FCRA, and UDCPA as alleged in this Complaint; and

4. Award Plaintiff the costs of bringing this action, as well as such other and additional relief as the Court may determine to be just and proper.

5. As a result of the above violations, Defendant is liable to the Plaintiff, for declaratory judgment that defendant's conduct violated the FTC Act, FDCPA, FCRA, and UDCPA, and that Plaintiff recover actual damages, statutory damages, punitive damages, costs and recovery of all fees.

Terence M Kearney v. Asset Acceptance, LLC Complaint for unlawful Debt Collection Violations

    6. Plaintiff has established Defendant served papers to Management at Plaintiff's former marina of residence and made calls to other parties. These events caused Plaintiff embarrassment, anxiety, and humiliation. Plaintiff also feared he would lose his moorage and place of residence. Plaintiff additionally seeks Oregon UDPCA actual, statuary, punitive damages, and costs.

Dated this 26th day of February, 2013

Terence M Kearney
PO Box 1207
Scappoose, OR 97056